IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

DAVID LEE DANIELS                                                                PLAINTIFF

v.                          Civil No. 06-5072

SHERIFF KEITH FERGUSON;
CORPORAL JESSEN; CORPORAL
McALESTER; and OFFICER LEE                                          DEFENDANTS

### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

The plaintiff filed this civil rights action pursuant to 42 U.S.C. § 1983. He proceeds pro se and in forma pauperis.

Plaintiff is currently incarcerated in the Arkansas Department of Correction. The events at issue in this lawsuit occurred while the plaintiff was incarcerated at the Benton County Detention Center. Specifically, plaintiff contends his constitutional rights were violated when he was given the wrong medication on December 30, 2005, and when he was repeatedly charged with disciplinary violations and placed on lock-down.

Defendants filed a summary judgment motion (Doc. 24). To assist plaintiff in responding to the motion, a questionnaire was propounded (Doc. 36).

Plaintiff filed a timely response to the questionnaire (Doc. 37). The summary judgment motion is before the undersigned for issuance of this report and recommendation.

-1-

AO72A
(Rev. 8/82)

## Background

Daniels was booked into the Benton County Detention Center (BCDC) on December 28, 2005, on charges of rape and sexual assault. *Plaintiff's Response* (Doc. 37) (*hereinafter Resp.*) at ¶ 1. When he was booked in, a medical questionnaire was completed. *Defendants' Exhibit* (*hereinafter Defts' Ex.*) 2 at page 1. The questionnaire indicates Daniels has asthma and that his right shoulder was hurt. *Id.* Daniels indicates he told them he had asthma and was on back pain medication. *Resp.* at ¶ 2.

On December 28th, Daniels submitted a medical request for an inhaler and medication for staph infection, high blood pressure, and Trichomonas. *Defts' Ex.* 2 at page 2. Although his medical request does not mention back pain, Daniels asserts he also told the doctor he was on pain medication for his back. *Resp.* at ¶ 5.

Daniels was seen by Dr. Mullins the following day. *Defts' Ex.* 2 at page 3. Dr. Mullins' notes indicate he asked Daniels where he had staph infection. *Id.* Daniels pointed to some spots on his arms and said he had it in his groin. *Id.* Dr. Mullins checked Daniels' arms and noted he had no sores. *Id.* Dr. Mullins also checked Daniels' groin and noted no infection was present. *Id.* Dr. Mullins noted Daniels may have had staph infection in the past as he had been treated by Dr. Huskins for it. *Id.*

Daniels maintains he still had staph infection. *Resp.* at ¶ 7 & ¶ 8. Daniels contends Dr. Mullins should have contacted Daniels' doctor, Dr. Huskins. *Id.* at ¶ 8 & ¶ 9.

AO72A
(Rev. 8/82)

When Dr. Mullins was done examining Daniels, he then told Dr. Mullins he had Trichomonas. *Defts' Ex.* 2 at page 3. Daniels stated he had been given a prescription for Trichomonas but had not filled it. *Resp.* at ¶ 11.

After Dr. Mullins stated he would take care of that, Daniels told Dr. Mullins he had asthma. *Defts' Ex.* 2 at page 3. According to Dr. Mullins' notes, he checked Daniels' lungs and found his lungs to be clear with no rales, no rhonchi, and no spasms. *Id.* Daniels, however, contends Dr. Mullins and Nurse McDonald never checked his lungs because they were prejudiced towards Blacks and did not want to touch him. *Resp.* at ¶ 13.

Dr. Mullins' notes indicate he told Daniels that if he got short of breath to come in and they would listen to his lungs. *Defts' Ex.* 2 at page 3. If Daniels had some spasms, Dr. Mullins indicated he told Daniels they would treat him but for the time being he was not going to give Daniels any medication for asthma. *Id.* Daniels denies that Dr. Mullins mentioned this. *Resp.* at ¶ 14.

Daniels told Dr. Mullins he also had a high blood pressure problem. *Resp.* at ¶ 15. Dr. Mullins noted Daniels' blood pressure was 100/70 which was low for an adult. *Defts' Ex.* 2 at page 3. According to Daniels, Nurse McDonald took his blood pressure and lied about the reading. *Resp.* at ¶ 15. Daniels asserts his blood pressure has never been this low. *Id.*

Dr. Mullins prescribed Metronidazole or Flagyl 500 mg., three times a day, for five days. *Defts' Ex.* 2 at page 3. Daniels states he did not receive this medication. *Resp.* at ¶ 17. Instead he indicates Inmate Davis received it. *Id.*

-3-

On December 30th, Daniels maintains he was given the wrong medication and as a result fell down the stops and was injured. *Resp.* at ¶ 17. On December 30th at 0710, Deputy Carson Lee was distributing medication and submitted the following incident report:

> I, Deputy Carson Lee, was distributing medications to D-149. I called for Inmate Davis, Jeremiah (OCA # 24822) to come receive his medications. I had the med sheets out on the counter and Inmate Daniels, David (OCA # 56714) came out to pod control. I gave Inmate Daniels three ibuprofen. He told me that he does not take ibuprofen. I had Inmate Daniels give the ibuprofen to me and I put them back in the medicine bottle. I looked at his med sheet and gave him the medication that is prescribed to him.

*Defts' Ex.* 3 at page 2.

According to Daniels, Lee called all the people up who were getting medication that morning, about seven people. *Resp.* at ¶ 18. Daniels states Lee had been up all night and just put all the medication in Daniels' hand. *Id.* at ¶ 19. Daniels just took the medication Lee gave him. *Id.* According to Daniels, "[w]hen I took it he said 'oops' I gave you the wrong meds, then gave me my right meds, 'I think', on top of the rest he had already gave me!" *Id.*

Daniels indicates Lee gave him Ibuprofen, a capsule with colors on it, some other pills, and the medication for Trichomonas. *Resp.* at ¶ 24. This was the first time Daniels had taken the medication for Trichomonas. *Id.*

However, Daniels then makes the contradictory assertion that Lee gave Daniels' medication to Davis. *Resp.* at ¶ 20. Daniels indicates Lee then told him not to tell anyone. *Id.*

At approximately 8:00 a.m., Deputy Free looked into D-149 and saw Daniels falling down the stairs. *Defts' Ex.* 3 at page 3. Daniels was mid-way down the stairs and started to fall forward hitting his knees on the stairs. *Id.* According to Free, Daniels grabbed the railing before falling to the floor. *Id.* According to Daniels, he fell all the way down the stairs to the bottom,

-4-

hitting his head and hurting his hand, back, knee, foot, and hip. *Resp.* at ¶ 21.  Daniels contends

his whole leg was bruised for months and his knee is swollen still today. *Id.*  Daniels states he

had an x-ray done on May 22, 2007. *Id.*

At 8:00 a.m., Corporal Jessen was informed by Deputy Free that an inmate in D-149 had

fallen on the stairs. *Defts' Ex.* 3 at page 1.  Jessen entered D-149 and found Daniels lying on the

floor on his right side. *Id.*  According to Jessen, Daniels told him that Daniels had been given

the wrong medication. *Id.*  Jessen reported that Daniels said he had received Ibuprofen instead

of his medication and was allergic to it. *Id.*

Daniels denies that he spoke to Jessen. *Resp.* at ¶ 23.  In fact, he states he was

unconscious. *Id.*  Daniels indicates about thirty people saw Jessen drag him into an empty cell

by his wrist causing him further injuries and showing no regard for his injuries. *Id.*

Jessen indicates he contacted Nurse McDonald about the situation and was told to find

out what medication Daniels had received. *Defts' Ex.* 3 at page 1.  Jessen had Lee come to D-

pod. *Id.*  Lee advised Jessen that Daniels had been given the medication prescribed to him. *Id.*

According to Jessen, he checked on Daniels again and he stated that his hip was broken. *Id.*

Jessen asserts Daniels stated he could not walk. *Id.*  Jessen reported this conversation to

McDonald and was told to place Daniels in a cell where he could to be observed. *Id.*  Daniels

was placed in cell 143. *Id.*

Daniels was seen by Dr. Mullins on January 5, 2006. *Defts' Ex.* 2 at page 4.  Daniels

reported falling down the stairs and hurting his right leg. *Id.*  Dr. Mullins started to raise Daniels

right leg and it was quite high and Daniels refused to allow Dr. Mullins to raise it any higher.

*Id.* Dr. Mullins believed Daniels was being uncooperative. *Id.* When Dr. Mullins started to raise Daniels' left leg, Dr. Mullins believed Daniels would not let it move. *Id.*

Dr. Mullins noted Daniels' left leg was supposed to be his good leg and that he had hopped all the way out of the office on it. *Defts' Ex.* 2 at page 4. Dr. Mullins noted that it didn't make sense that Daniels could hop on the left leg but wouldn't let Dr. Mullins examine it. *Id.*

Daniels blood pressure was checked and it was 120/60. *Defts' Ex.* 2 at page 4. Daniels got mad and said he wanted a blood pressure machine. *Id.*

According to Dr. Mullins' notes, Daniels demanded to know Dr. Mullins' name so Daniels could do something to him. *Defts' Ex.* 2 at page 4. Dr. Mullins was not sure what. *Id.* Dr. Mullins believed Daniels was malingering. *Id.* Dr. Mullins concluded Daniels had questionable pain in the right hip. *Id.* He prescribed Ibuprofen, 600 m.g., twice a day, for five days. *Id.*

Daniels indicates his legs and foot were black and blue and Dr. Mullins was causing him more pain. *Resp.* at ¶ 30. He also indicates his attorney at the time saw the injuries and "filed a habeas corpus." *Id.* Daniels asserts that Dr. Mullins saw the injuries and put Daniels on medication, felt a knot on his hip, and swelling in his legs and knee. *Id.* at ¶ 31 & ¶ 34. Daniels indicates he went for x-rays on May 22, 2007 at the Brickeys Unit of the ADC because Benton County would not take x-rays. *Id.*

On January 9, 2006, Daniels submitted a grievance in which he stated he had been given Barry Hoyt's medication on December 30th. *Resp.* at ¶ 35. He indicated he became ill and started vomiting. *Id.* When he left his cell to get help, he stated he fell down the stairs and became unconscious. *Id.* While unconscious, he indicated Jessen and McLester dragged him

-6-

into a cell and left him for two days.  *Id.*  Captain Petray responded that the incident had been investigated and did not happen the way Daniels said.  *Id.*

On January 10th, Daniels submitted a grievance in which he stated on January 6th and 7th, Officer Catlin refused to allow another inmate to carry his tray for him.  *Resp.* at ¶ 36.  He indicated he could not carry his own tray.  *Id.*  Daniels stated Catlin took his tray away and he went hungry.  *Id.*  Additionally, he indicated he still had not been taken for x-rays and was in pain.  *Id.*  Petray responded that the doctor makes the medical decisions at the jail.  *Id.*

On January 20th, Deputy Vaughn reported that when he was passing out mail in D-149 there was a letter being returned to Inmate Brazzell.  *Defts' Ex. 3 at page 7.*  Brazzell said he had not sent the letter.  *Id.*  The letter was to Andrea Sharp.  *Id.*  A check was made of the mail log and the only inmate who had mailed letters to Sharp was Daniels.  *Id.*  Vaughn then opened the letter and found it had been signed by a person named David.  *Id.*

Daniels was asked about the letter and denied writing it.  *Resp.* at ¶ 38.  However, he indicated Sharp was the mother of his baby.  *Id.*  Vaughn informed Daniels that he was going to be locked down for impersonating another person.  *Id.*  Daniels indicates he was locked down for thirty days.  *Id.*  However, he maintains he did not write to Sharp.  *Id.*

On January 21st, Daniels submitted a grievance stating that as soon as he was off lock-down he had been placed back on it.  *Resp.* at ¶ 39.  Daniels indicated he wanted to appeal.  *Id.*  Petray stated that if he chose to appeal the lieutenant would review it.  *Id.*

Daniels indicates this is what happened all the time.  *Resp.* at ¶ 39.  He states the officers would change his date to get off lock-down and give him excessive lock-down time.  *Id.*  He maintains the officers were prejudice against Blacks and he was the only Black in the pod.  *Id.*

-7-

On January 25th, 26th, and 27th, Daniels submitted grievances about needing to use the phone to speak to DHS, call the hospital, approve bank transactions, etc. *Defts' Ex.* 4 at pages 5-7. In response, he was told that inmates on lock-down could only use the phone for legal and/or bondsman calls not personal calls. *Id.*

On January 26th, Daniels submitted a medical request. *Resp.* at ¶ 41. He stated he had a blood clot in his left leg. *Id.* Daniels maintains the clot was a result of the fall down the stairs. *Id.*

On January 28th, Daniels asked to appeal his lock-down. *Defts' Ex.* 4 at page 8. He complained the rules were not being followed and he said the handbook should be given to inmates when they arrived at the detention center. *Id.* In response, he was told he signed a copy of the rules when he was booked in. *Id.*

Daniels was seen by Dr. Mullins on January 30th. *Defts' Ex.* 2 at page 5. He checked Daniels' left leg. Daniels' left calf was swollen and he had a bruised ankle. *Id.* He had apparently fallen. *Id.* He had blood that had "slithered down" to his ankle. *Id.* Dr. Mullins diagnosed a contusion to Daniels' left leg and prescribed Ibuprofen, 600 m.g., three times a day, for fourteen days. *Id.* Dr. Mullins did not believe Daniels had a clot in any particular blood vessel. *Id.* Daniels maintains Dr. Mullins should have done an x-ray. *Resp.* at ¶ 43.

Daniels was seen by Dr. Mullins again on January 31st. *Defts' Ex.* 2 at page 6. Dr. Mullins noted that Daniels left leg was still swollen. *Id.* However, Dr. Mullins told Daniels it was too soon for that to have gone down. *Id.* Dr. Mullins prescribed Lasix and KCL, three times a day for five days, and then twice a day for five days. *Id.* He also indicated Daniels could lay

-8-

down for three days.  *Id.*  Dr. Mullins indicated Daniels should be seen by Dr. Howard in one week.  *Id.*

On February 1st, Deputy Dapp reported that while picking up trays he observed that Daniels were not locked down.  *Defts' Ex.* 3 at page 9.  Daniels was escorted to his cell and told his mat and bed roll were going to be pulled.  *Id.*  When the deputies entered Daniels' cell, they reported they found an extra t-shirt and confiscated it.  *Id.*  On February 1st, Deputy Hammack also found a newspaper in Daniels' cell and locked him down for having the newspaper in his cell.  *Defts' Ex.* 3 at page 8.   According to Daniels, the officers would make up reasons to lock him down and harass him because he was Black and had rape charges against him.  *Resp.* at ¶ 45 & ¶ 46.

On February 8th Daniels requested medical attention for his leg.  *Defts' Ex.* 2 at page 8.  He indicated it was puffing up and hurt.  *Id.*  He stated the pain ran up and down his leg and back.  *Id.*

On February 8th, Daniels' cell mate, Johnson, asked to change cells because Daniels did not shower.  *Resp.* at ¶ 49.  Deputy Hammack entered Daniels' cell and Johnson moved his things.  *Id.*  The cell was then shook down.  *Id.*  Hammack found newspaper clippings in an envelop.  *Id.*  Daniels indicated the clippings were for evidence.  *Id.*  He was told he could not have clippings and that he was being locked down.  *Id.*

Daniels was seen by Dr. Howard on February 9th.  *Resp.* at ¶ 50(A).  He noted that Daniels was walking well but that he complained that it hurt to sit down.  *Id.*  He diagnosed Daniels with a bruised right hip and swelling in his leg.  *Id.*  Daniels was prescribed Naproxen.  *Id.*

-9-

On February 14th, Daniels submitted a medical request asking that his knee, back, and right butt cheek be examined. *Defts' Ex.* 2 at page 9. Daniels was seen by Dr. Mullins on February 16th. *Id.* at page 10. He indicated Daniels requested an inhaler and medicine for his left hip. *Id.* Dr. Mullins noted Daniels' straight leg raising test was negative. *Id.* Dr. Mullins noted Daniels had some discomfort in his left hip but it did not appear serious. *Id.* Examination of his lungs revealed very few small spasms. *Id.* Dr. Mullins concluded Daniels had very mild asthma and some possible arthritis of the left hip. *Id.* Dr. Mullins prescribed an Albuterol Inhaler and Naproxen for three weeks. *Id.*

On February 22nd, during a shakedown two hard plastic cards fell out of Daniels' Bible. *Defts' Ex.* 3 at page 13. Daniels denied knowing where the cards came from. *Id.* Daniels was given a disciplinary hearing and found guilty. *Id.* at page 14. Daniels was given ten days lockdown and loss of privileges. *Id.* Daniels appealed. *Id.* The decision was affirmed by Carter. *Id.* Daniels maintains he was locked down for thirty days for something that never happened. *Resp.* at ¶¶ 53 & 54.

On February 27th, Daniels was seen using the pod phones in D-149. *Defts' Ex.* 3 at page 15; *Resp.* at ¶ 55. He was charged with unauthorized correspondence, attempted correspondence, or contact with the public. *Id.* A disciplinary hearing was held and Daniels was found guilty and given lock-down for ten days with loss of privileges. *Id.* at page 16. Daniels appealed the decision and Carter affirmed. *Id.* Daniels maintains the look-down was actually for thirty days. *Resp.* at ¶ 56.

On February 27th, Daniels filed a grievance stating Officer Free called his "nigga" and someone put "nigger blood" on his cell door. *Resp.* at ¶ 57. Daniels also said Officer Turner

-10-

told him to get the "f— on the wall." *Id.* Petray indicated he had investigated and the officers

had not made these statements. *Id.* Daniels maintains these incidents occurs and Petray stuck

up for his officers even if they "were dead wrong." *Id.*

On February 27th, Daniels submitted a medical request because of his neck and back.

*Resp.* at ¶ 58. On February 28th, Daniels again complained that someone had put "nigger blood"

on his door. *Id.* at ¶ 59. Petray responded that he had talked to the deputies and no one knew

who had done it. *Id.* Daniels states it was done in pen. *Id.* If an inmate had written it, Daniels

indicates it would have been written in pencil. *Id.*

On March 2nd, Daniels requested medical treatment for his leg and was to see the doctor

but he was in court when doctor call was done. *Defts' Ex.* 2 at page 45. On March 5th, Daniels

submitted a grievance complaining that he was being locked down over and over for the smallest

of things by the same officers. *Resp.* at ¶ 60. He stated the officers were prejudiced and judged

him because of his charges and his race. *Id.* Petray responded that Daniels was being treated no

differently than other inmates. *Id.*

On March 5th, Daniels requested a book from the law library. *Resp.* at ¶ 60(C). Daniels

was informed by Carter that he needed to contact his attorney for legal assistance. *Id.*

On March 7th, Daniels was seen by Dr. Mullins. *Defts' Ex.* 2 at page 12. Daniels told

Dr. Mullins he was having pain in his back. *Id.* When Dr. Mullins asked Daniels where in his

back, Daniels indicated it was cervical (neck area) or thoracic (chest & rib area) or lumbosacral

(lower back) area. *Id.* According to Dr. Mullins, Daniels then pointed to the lumbosacral or

slightly above it. *Id.*

-11-

Dr. Mullins' notes also indicated Daniels reported having some pain in his legs. *Defts'*
*Ex.* 2 at page 12. Dr. Mullins noted that Daniels walked in and out of the office without any
difficulties. *Id.* Daniels' straight leg raising test was negative. *Id.* Daniels wouldn't answer Dr.
Mullins when he asked how old Daniels was. *Id.*

Dr. Mullins concluded Daniels had questionable back pain. *Defts' Ex.* 2 at page 12. Dr.
Mullins believed Daniels was exaggerating his symptoms. *Id.* Dr. Mullins noted he did not
know if Daniels was drug seeking or not but he did not believe his complaints matched the
physical findings. *Id.* Dr. Mullins did not believe Daniels needed any treatment at that time.
*Id.* Dr. Mullins noted Daniels had a bad attitude and was very negative. *Id.*

Daniels indicates he stayed in pain until Dr. Huskins took Dr. Mullins' spot. *Resp.* at ¶
62. At that time, Dr. Huskins gave Daniels his sneakers and some hard pain pills that relaxes
Daniels' muscles. *Id.*

On March 15th, Daniels was given a disciplinary by Cpl. Bryson for refusing to obey an
order of a deputy. *Defts' Ex.* 3 at pages 17 & 20. Defendants' exhibits indicate Daniels had
failed to follow an order to face the wall and not talk. *Id.* Daniels was found guilty and locked
down for ten days. *Id.* He appealed the decision and the decision was upheld. *Id.* at page 20.

Daniels, however, asserts this incident never happened. *Resp.* at ¶ 64(A). Instead, he
states Bryson physically abused him by bending his hand backwards and injuring his wrist and
hand. *Id.*

On March 15th, Daniels received a letter. *Resp.* at ¶ 65. Inside was a check for $103
from the Law Offices of John R. VanWinkle. *Id.* Corporal Tomlin told Daniels he would return

-12-

the check to the sender. *Id.* Daniels indicates his cell was searched that day and his legal papers taken so the officers could see what lawsuits his attorney had filed. *Id.*

On March 16th, Daniels submitted a request to get his legal papers out of his property. *Resp.* at ¶ 66(A). He indicated they had been taken by mistake. *Id.* In response, he was told that his papers would remain in his property and there was no reason he should need them. *Id.*

On March 19th, Daniels submitted a grievance stating that probable cause paperwork and letters had been taken from his cell. *Resp.* at ¶ 66(B). Carter responded that no legal paperwork was removed from his cell. *Id.*

Daniels indicates his theft of property case legal documents were taken as well as documents regarding his mental health, his probable cause papers, and documents from his lawsuits. *Resp.* at ¶ 66(C). As a result of the documents being removed, he states he could not help study the case and lost at trial and missed the appeal date on several cases. *Id.*

According to defendants' records, on March 22nd Daniels exited his cell with his t-shirt tucked in. *Defts' Ex.* 3 at page 21. Deputy Paul had warned Daniels on several different occasions not to leave his cell without tucking his shirt in. *Id.* Paul charged Daniels with a disciplinary for exiting his cell without wearing his uniform in a correct manner. *Id.* at page 22. Daniels was found guilty and given five days lock-down with loss of privileges. *Id.* Daniels appealed and the decision was upheld. *Id.* Daniels maintains this entire incident did not happen. *Resp.* at ¶ 68.

On April 4th, Daniels submitted a medical request. *Resp.* at ¶ 69. He asked for his blood pressure to be checked. *Id.* He also indicated he was having pain in his shoulder and back and blood in his urine. *Id.* He stated this was his 8th request for medication. *Id.*

-13-

According to defendants' records, Nurse McDonald took Daniels' blood pressure on April 5th and noted it was 140/80. *Defts' Ex.* 2 at page 45. She noted that Daniels was complaining of being dizzy. *Id.*

Daniels denies that Nurse McDonald checked his blood pressure. *Resp.* at ¶ 70. Daniels indicates she didn't want to touch him because she is a racist. *Id.* at ¶ 71.

On April 14th and April 16th, Daniels requested medical attention for back pain. *Resp.* at ¶ 72. Daniels was seen by Nurse McDonald on April 17th. *Defts' Ex.* 2 at page 45. She noted Daniels sat on the examination table with one leg off the foot stool and one leg on. *Id.* She noted Daniels had no problems ambulating. *Id.* She gave Daniels 600 mg. of Ibuprofen for back pain. *Id.* Daniels denies he was seen this day and states he stayed in pain. *Resp.* at ¶ 73. He also states he requested an x-ray. *Id.*

According to Dr. Mullins' notes, he was Daniels on April 24th. *Defts' Ex.* 2 at page 18. Dr. Mullins noted Daniels' blood pressure was 130/80 which was normal. *Id.* Daniels reported to Dr. Mullins that he had been having dizzy spells and blood in his urine. *Id.* Daniels had a few spasms in his lungs and Dr. Mullins Daniels had asthma so he continued Daniels' inhaler. *Id.* Because of Daniels' complaint of blood in his urine, Dr. Mullins ordered a urinalysis. *Id.*

Daniels denies that he saw Dr. Mullins on this date. *Resp.* at ¶ 75. According to Daniels, "[o]fficers stopped me from seeing the Doctor many times, but would log in that I saw him." *Id.*

On April 30th, Daniels submitted a grievance stating that Officers Adams hide his medication sheet to prevent his from being able to get your asthma inhaler. *Resp.* at ¶ 76. In

-14-

response, Petray indicated he would have the lieutenant talk to Daniels. *Id.* However, Daniels states the lieutenant never talked to him. *Id.*

Daniels submitted a second grievance about this incident that day. *Resp.* at ¶ 77(A). In response, Petray indicated he had talked to Adams and this had not happened. *Defts' Ex.* 4 at page 16.

On May 2nd, Daniels submitted a grievance stating that he had not been getting all his mail and it was not being recorded in the computer. *Resp.* at ¶ 78. Petray responded that all incoming and outgoing mail was logged in. *Id.*

Dr. Mullins' records indicate he saw Daniels on May 4th. *Defts' Ex.* 2 at page 19. Daniels complained of left shoulder pain and a knot on his back. *Id.* Dr. Mullins noted Daniels had a full range of motion of his left shoulder. *Id.* Daniels had some normal tissue on his lower back but no nodules or any pathology. *Id.* Dr. Mullins concluded he had questionable pain in the left shoulder. *Id.* He prescribed Ibuprofen, 600 m.g., twice a day, for four days. *Id.* Daniels asserts "[t]his never happened." *Resp.* at ¶ 79(A).

On May 6th and 7th, Daniels requested medical treatment for back pain. *Defts' Ex.* 2 at pages 20-22; *Resp.* at ¶¶ 80-81. Daniels requested another medication or another solution. *Id.* He also requested that his blood pressure be checked. *Id.*

Daniels was seen by Nurse McDonald on May 8th. *Resp.* at ¶ 82; *Defts' Ex.* 2 at page 45. She noted Daniels wanted an increase in pain medication for his shoulder but that he did not seem to be having any problems using his shoulder. *Defts' Ex.* 2 at page 45. She noted Daniels then asked for arch support in his shoes. *Id.* Daniels' request was denied. *Id.* Nurse McDonald noted that Dr. Mullins had examined Daniels' shoulder and found no abnormalities. *Id.* Nurse

-15-

McDonald discontinued the Ibuprofen. *Id.* Daniels notes he was also requesting something for his back. *Resp.* at ¶ 82.

On May 9th, Daniels submitted a medical request stating that he needed to see the doctor not the nurse. *Resp.* at ¶ 83. Nurse McDonald responded indicating that Dr. Mullins had received the record at 9:00 a.m. on May 9th and did not need to see Daniels. *Id.*

On May 10th, Daniels submitted a medical request. *Resp.* at ¶ 84. Daniels stated it was his third request to see the doctor. *Id.* He stated the nurse was refusing to let him see the doctor about his pain, blood pressure, and hypertension. *Id.* Nurse McDonald responded that the Doctor had reviewed his record and stated that he already examined Daniels and would not see him for the same complaints again. *Id.* Daniels was told he was abusing the medical system. *Id.*

On May 14th, Daniels was locked down after being involved in an altercation with Inmate Ambriz. *Resp.* at ¶ 85. Daniels was charged with fighting, found guilty, and given thirty days lock-down and loss of privileges. *Defts' Ex.* 3 at page 26. Daniels appealed. *Id.* The decision was upheld by Carter. *Id.* Daniels asserts he was not fighting with Ambriz only passing words with him. *Resp.* at ¶ 86.

On May 16th it was discovered Daniels had more envelopes and paper than was allowed and that he had covered his vents with paper. *Defts' Ex.* 3 at pages 27-28. Further, items were found in his cell that were not allowed. *Id.* Daniels was found guilty of a disciplinary violation for concealing items from jail staff and of placing items on cell walls or fixtures. *Defts'* Ex. 3 at pages 30-31. Daniels was given ten days lock-down and loss of privileges for the first violation

-16-

and five days lock-down and loss of privileges for the second violation. *Id.* He appealed and the decisions were upheld. *Id.*

Daniels maintains he was not guilty of this conduct. *Resp.* at ¶ 87 & ¶ 88. Moreover, he states he was given thirty days lock-down. *Id.* at ¶ 88.

On May 16th, according to Deputy Bennett, he ordered Daniels to get out of the shower because Daniels had not been given permission to take a shower. *Defts' Ex.* 3 at page 29. Daniels was given a disciplinary for disobeying the order of a deputy, found guilty, and given ten days lock-down with loss of privileges. *Defts' Ex.* 3 at page 34. Daniels appealed and the decision was upheld. *Id.*

Daniels, however, states he had been given a hair cut by the other officer working with Bennett and had been given permission to take a shower. *Resp.* at ¶ 89(A). He also asserts he was given thirty days lock-down. *Id.* at ¶ 89(B).

On May 16th, Daniels requested medical treatment. *Defts' Ex.* 2 at page 25. He stated he needed his medication and a snack bag lunch because he was anemic. *Id.*

According to Nurse McDonald's notes, she saw Daniels on May 19th. *Defts' Ex.* 2 at page 46. Daniels complained of his back, shoulder, and stomach. *Id.* McDonald found no problems on examination. *Id.* Daniels maintains "[t]his never happen[ed]." *Resp.* at ¶ 91.

On May 17th, Daniels was seen by Deputy Aberle with two food trays. *Defts' Ex.* 3 at page 32. When Aberle asked Daniels who gave him the tray, Daniels refused to tell him. *Id.* Daniels was given a disciplinary for stealing or being in possession of stolen property, found guilty, and given thirty days lock-down and loss of privileges. *Resp.* at ¶ 93. Daniels appealed and the decision was upheld. *Id.*

-17-

On May 20th during a shake down Deputy Vaughn reported finding an extra t-shirt in Daniels' cell and a towel Daniels was not supposed to have because he was on lock-down. *Defts' Ex.* 3 at page 35. Daniels was given a disciplinary for possession of unauthorized items, found guilty, and given ten days lock-down with loss of privileges. *Id.* at page 36. Daniels appealed the decision and it was upheld. *Id.*

Daniels states this incident did not happen. *Resp.* at ¶ 94 & ¶ 95. However, he indicates he was given thirty days lock-down. *Id.* at ¶ 95.

On May 21st, Daniels submitted a grievance stating his mail was being tampered with. *Resp.* at ¶ 96(A). In response, Petray responded that no one was tampering with Daniels' mail. *Id.* Daniels maintains both his legal and personal mail was tampered with. *Id.* at ¶ 96(B). He indicates some mail being sent to him was being sent back and mail he was sending out was thrown out, or opened and reglued. *Id.* He also states the jail and prosecutor still have some of his mail. *Id.*

On May 22nd, Daniels submitted a medical request stating he was bleeding from his backside. *Resp.* at ¶ 97. Daniels was seen by Dr. Mullins on May 23rd. *Defts' Ex.* 2 at page 27. According to Dr. Mullins' notes, Daniels requested special shoes. *Id.* Daniels told Dr. Mullins he came into the detention center with special shoes that had a lift in them. *Id.* Dr. Mullins noted that Daniels had been in the BCDC since December and this was the first time he had mentioned special shoes. *Id.* Dr. Mullins indicated he would write Daniels' doctor, Dr. Huskins, and ask why he recommended special shoes. *Id.*

Dr. Mullins' notes indicate Daniels then indicated he was bleeding from his buttocks. *Defts' Ex.* 2 at page 27. Examination revealed no sores, abrasions or blood. *Id.* Dr. Mullins

-18-

could see nothing that would cause bleeding.  *Id.*  There was no blood on Daniels' shorts.  *Id.*
Dr. Mullins believed Daniels was exaggerating his symptoms.  *Id.*

Daniels maintains he had mentioned his shoes months before.  *Resp.* at ¶ 98.  Daniels also
indicates Dr. Mullins never spoke with Dr. Huskins.  *Id.*  With respect to the blood, Daniels
asserts Dr. Mullins saw the blood on Daniels' boxers and gave him medication for a rash.  *Id.*
at ¶ 99.

The medical records contain a release form indicating Nurse McDonald requested
information regarding the orders for orthopedic shoes for David Daniels from Dr. Huskins' office
on May 23rd.  *Defts' Ex. 2* at page 28.  Daniels, however, asserts Nurse McDonald did not
request the records.  *Resp.* at ¶ 100.

On May 24th, Daniels submitted a grievance asking to be allowed to shower every day.
*Resp.* at ¶ 101.  He stated he was breaking out from the heat as well as the metal he sat on.  *Id.*
He indicated his cell needed cleaning and the dust was affecting his asthma.  *Id.*  He also stated
that he had sores on his butt from the filth.  *Id.*  In response, he was told if he had a medical
problem to fill out a medical request.  *Id.*

On May 25th, Daniels submitted a medical request complaining that the poor ventilation
and dust mites were aggravating his lungs.  *Resp.* at ¶ 102.  On May 26th, Daniels submitted a
medical request complaining there was blood coming out of his penis.  *Resp.* at ¶ 103.  He said
he had been urinating blood since the night before.  *Id.*  He indicated he had showed Powell.
Daniels stated it hurt to urinate.  *Id.*  He indicated this was the third time he had told the nurse
and she only advised him to drink more water.  *Id.*  He indicated he needed medication, a kidney
treatment, or an x-ray.  *Id.*

-19-

Nurse McDonald talked to Powell that day. *Defts' Ex.* 2 at page 46. Powell said he didn't see any blood in Daniels' urine but did see some specks on his shorts but not red blood. *Id.* Nurse McDonald indicated Daniels would be seen by Dr. Mullins on his return. *Id.* She ordered a urinalysis and Daniels was prescribed Cipro, an antibiotic. *Id.*

Daniels asserts Nurse McDonald did not order the urinalysis. *Resp.* at ¶ 104(A). He did receive the prescribed medication. *Id.*

On May 27th, Daniels submitted a medical request stating he had staph infection, needed an inhaler for asthma, needed penicillin for V-D, his orthopedic shoes for support, and some fillings fell out of his teeth. *Resp.* at ¶ 105. On May 30th, Daniels submitted a grievance stating he had requested medical attention for staph infection, medication for his asthma, high blood pressure, and because a filling had fallen out of his tooth ½ month ago. *Id.* at ¶ 106. He also stated that he needed to shower every day to stop the itching. *Id.* He indicated he had been complaining for months and something needed to be done. *Id.* In response, Petray indicated he would forward Daniels' grievance to medical. *Id.* at ¶ 107. Petray indicated the doctor made all medical decisions in the jail. *Id.*

On May 30th, Daniels submitted a medical request stating that blood had been coming out of his penis and he still had not been given the results of his test. *Resp.* at ¶ 108. He also indicated he had not received his asthma medication so he had to use his inhaler all the time. *Id.*

Daniels was seen by Dr. Mullins on May 30th. *Defts' Ex.* 2 at page 35. Dr. Mullins noted Daniels had been seen nine times since December. *Id.* Dr. Mullins asked if Daniels went to the doctor that much on an outpatient basis and Daniels told him yes that he went every

-20-

month.  *Id.*  Dr. Mullins indicated he would write Daniels' doctor, Dr. Huskins, to see how often

Daniels had seen him.  *Id.*

Daniels told Dr. Mullins that he had been bleeding from your penis.  *Defts' Ex.* 2 at page

35.  Dr. Mullins checked Daniels' penis and noted no bleeding or discharge.  *Id.*  Daniels then

asked for a midnight snack.  *Id.*  Daniels' request was refused.  *Id.*  Daniels then told Dr. Mullins

he had a staph infection in his right leg.  *Id.*  Dr. Mullins examined Daniels' leg and concluded

there was no infection, no scratch, no irritation, no redness, no erythema, and no induration.  *Id.*

Dr. Mullins believed Daniels was a hypochondriac and might be seeking drugs.  *Defts'*

*Ex.* 2 at page 35.  After Dr. Mullins had checked all Daniels' complaints, he then told Dr.

Mullins he needed something for his back.  *Id.*  Dr. Mullins checked Daniels' back and his

straight leg raising test was negative.  *Id.*

Dr. Mullins gave Daniels Benadryl for five nights.  *Defts' Ex.* 2 at page 36.  When Dr.

Mullins was signing Daniels' record, Daniels told Dr. Mullins he had a filling fall out.  *Id.*  Dr.

Mullins checked Daniels right upper teeth.  *Id.*  Dr. Mullins noted there wasn't an area big

enough to have a filling.  *Id.*  However, he did see some darkened area on the side of about three

molars.  *Id.*  Dr. Mullins indicated they would observe that.  *Id.*

According to Daniels, Dr. Mullins never wrote to Dr. Huskins, did not check anything,

and only got mad and told Daniels to get out.  *Resp.* at ¶¶ 109-111.  Daniels maintains Dr.

Mullins stated Daniels could sue him if he wanted to because he had two sons who study law.

*Id.* at ¶ 111.

According to defendants, on June 1st, Corporal Reams ordered Daniels to tuck his t-shirt

in.  *Defts' Ex.* 3 at pages 37-38.  Daniels did not obey and ignored an order to keep his free hand

-21-

behind his back.  *Id.*  Reams grabbed Daniels left arm to stop him and he pulled away from

Reams.  *Id.*  Daniels was placed against the wall, handcuffed, and escorted to his cell.  *Id.*

Deputy Hernandez assisted Reams in handcuffing Daniels and escorting him to his cell.  *Id.*

Daniels paperwork was taken from him and placed in his cell.  *Id.*

According to Daniels, he was coming back in from court carrying five to ten inches of

paperwork when Reams and Hernandez were told by Tomlin to beat him up.  *Resp.* at ¶ 113(A).

Daniels indicates Reams and Hernandez jumped on him and punched him in the side and head

and slammed him into the wall and ground.  *Id.* at ¶ 113(A).  Daniels asserts he was bleeding and

bruised as a result of the incident and in pain for a few months.  *Resp.* at ¶¶ 113(A)-¶ 113(C).

Daniels indicates he requested medical treatment but never got it.  *Id.*  According to Daniels,

Adam Leadford witnessed the entire incident.  *Id.* at ¶ 113(A).

Daniels submitted a grievance that day complaining that Reams and Hernandez had

shoved him against the wall and took his paperwork from him.  *Resp.* at ¶ 114.  Petray responded

that Daniels was not beaten up.  *Id.*

On June 6th Deputy Arhangelsky found a sandwich and an envelope with cereal in it in

Daniels' cell.  *Resp.* at ¶ 115.  Daniels was told he would be locked down for concealing food.

*Id.*  Daniels was given a disciplinary for storing food, found guilty, and given five days lock-

down and loss of privileges.  *Defts' Ex.* 3 at page 40.  He appealed and the decision was upheld.

*Id.*  Daniels indicates he was given ten days lock-down.  *Resp.* at ¶ 116.

On June 7th, Daniels submitted a medical request asking for a mid-night snack.  *Defts'*

*Ex.* 2 at page 37.  In response, Nurse McDonald wrote that Daniels had been put on medicine and

the problem should be cleared up.  *Id.*  She stated Daniels did not need a mid-night snack.  *Id.*

-22-

On June 10th, Daniels submitted a grievance. *Resp.* at ¶ 119.  He stated that his back was getting worse from sitting on metal.  *Id.*  He indicated it was very painful and he needed support. *Id.*  He also indicated he still had not gotten his allergy medication, Singular, his asthma medication, his high blood pressure medication, and had not had an x-ray.  *Id.*  He also indicated he had not been given the results of his urine test.  *Id.*  In response, Petray stated the doctor made the medical decisions at the jail.  *Id.*

On June 12th, Daniels submitted a grievance about the phone. *Resp.* at ¶ 120.  He was informed he was on lock-down status and could not make personal phone calls.  *Id.*  Daniels, however, asserts he was not given an hour out so could not use the phone to call his attorney or bondsman.  *Id.*

On June 15th, Daniels submitted a medical request. *Resp.* at ¶ 121.  He stated his back was out.  *Id.*  He indicated Petray had said it was up to the doctor whether he could have a mat or not.  *Id.*  Daniels states nothing was done about this request.  *Id.*

On June 18th during a shake down, Deputy Clark reported finding a bedroll stored under Daniels' bunk. *Defts' Ex.* 3 at page 41.  Daniels was given a disciplinary, found guilty, and given ten days lock-down and loss of privileges.  *Id.*  Daniels appealed and the decision was upheld. *Id.*

Daniels asserts a bedroll was not found under his bed. *Resp.* at ¶ 122.  He also states he was given thirty days lock-down.  *Id.* at ¶ 123.

On June 19th, Daniels submitted a medical request stating that his penis was still hurting. *Resp.* at ¶ 124.  He was by Dr. Mullins on June 20th.  *Id.* at ¶ 125.  A urinalysis was taken and

-23-

a prescription given to him for Cipro an antibiotic. *Id.* Daniels, however, contends the urine was never sent out to be tested. *Id.*

On June 27th, Daniels submitted a medical request starting he needed to see the doctor about his back. *Resp.* at ¶ 126. On June 28th, Daniels submitted a grievance complaining that Officer Foster and Officer Tomlin were harassing him and were prejudiced against him. *Id.* at ¶ 127(A).

Daniels was asked to explain how he believed he was being discriminated against, he replied:

> I had my towel and boxers & soap out on the table, and Officer Tomlin told Foster to take it from me, so I could not take a shower. These two focus on me every time they worked. It was out of hand at one point. I was singled out by these officers every time they worked. I have witness who will testify to this. Plus they would call me to pod control, and make me take off my cloth's, because they said they were to big & clean for me, and give me dirty clothes all the time, so I had to wear dirty close that other inmates already had on, I had no choise.

*Resp.* at ¶ 127(B).

Daniels was seen by Dr. Mullins on July 6th. *Defts' Ex.* 2 at page 42. Daniels told Dr. Mullins he needed his shoes. *Id.* Daniels showed Dr. Mullins an MRI that was done in 2003 that showed some minor disc disease in his lower back. *Id.* He did not know what medical treatment he had received for the disc disease. *Id.*

Dr. Mullins' notes indicate that he told Daniels he did not need shoes because he was not running around the jail much, doing much walking, or leaping, or climbing. *Defts' Ex.* 2 at page 42. Dr. Mullins again asked Daniels to explain what the doctors had done for him in 2003. *Id.* When Daniels could not do that, he just said: "that's alright doctor" and walked out of the exam room. *Id.*

-24-

Dr. Mullins did not believe Daniels' back was "killing" him. *Defts' Ex.* 2 at page 42. Dr. Mullins did not believe any treatment was needed and Daniels refused to finish the consultation with Dr. Mullins. *Id.* According to Daniels, Dr. Mullins was always verbally and physically harsh towards him. *Resp.* at ¶ 130.

On July 10th, Daniels returned from court and had some legal paperwork with him. *Defts' Ex.* 3 at page 43. Sgt. Nance told Daniels to put his hands behind his back and that he could hold the paperwork behind his back. *Id.* Daniels did not obey the order. *Id.*

Daniels was given a disciplinary, found guilty, and given ten days lock-down with loss of privileges. *Defts' Ex.* 3 at page 46. He appealed and the decision was affirmed. *Id.*

Daniels indicates he had a motion for discovery with him that was 400 to 500 pages long. *Resp.* at ¶ 131. Despite this, Daniels states Nance wrote him up. *Id.* Daniels also indicates the lock-down he received was thirty days. *Id.* at ¶ 132.

On July 10th, Deputy Larkin shook down Daniels' cell. *Defts' Ex.* 3 at pages 44-45. Larkin reported that he found a pink pencil top eraser. *Id.* He asked where Daniels got it and he replied that he did not know. *Id.* Daniels told Larkin he could read his paperwork. *Id.* Larkin told Daniels the paperwork was no concern of his. *Id.* Daniels told Larkin he was going to add him to the lawsuit. *Id.*

Daniels was charged with a disciplinary, found guilty, and given ten days lock-down with loss of privileges. *Defts' Ex.* 3 at page 47. He appealed and the decision was affirmed. *Id.*

Daniels contends an officer had given him the eraser two weeks before. *Resp.* at ¶ 133. He also asserts that the lock-down was for thirty days. *Id.* at ¶ 134.

-25-

On July 23rd, Daniels submitted a grievance asking to be moved out of the pod because of racial tension. *Defts' Ex.* 4 at page 31. He stated that twenty-three hour lock-down was out of the question. *Id.* He also indicated he was there for theft of property–not rape and the rape charge needed to be taken out of the computer. *Id.* Petray responded that Daniels would remain where he was at. *Id.*

On July 26th, Daniels submitted a grievance stating that Tomlin refused to give him his inhaler at 6:20 a.m. *Resp.* at ¶ 136(A). He said Tomlin was a racist. *Id.* Daniels indicated Tomlin was also tampering with his mail. *Id.* Petray responded that this did not occur and no one was tampering with Daniels' mail. *Id.*

Daniels was given access to his inhaler that day but not by Tomlin. *Resp.* at ¶ 136(B). He was allowed to have his inhaler on an as needed basis. *Id.* All he had to do was ask for it. *Id.* However, when Tomlin was on duty, Daniels maintains he would state he was right on it when Daniels requested his inhaler and then ignore Daniels. *Id.*

Daniels was asked whether a policy or custom of Benton County resulted in his being provided the wrong medication on December 30, 2005, he responded: "Yes." *Resp.* at ¶ 145. He was then asked to describe in detail the custom or policy and how it resulted in his being provided the wrong medication. He stated:

> It was not policy that resulted in my being provided the wrong medication. It was the negligance and inattentiveness of the officer handing out meds on December 30, 2005 that resulted in my being provided with the wrong medication. Officers are not licensed or otherwise qualified to administer prescribed medications. It is the custom of Benton County to place officers in the position of a qualified medical professional for the administering of prescribed medications.

-26-

*Resp.* at ¶ 145.  Daniels asserts he was handed the wrong medication on other occasions but gave it back to the officers.  *Id.* at ¶ 147(B).

### Summary Judgment Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

### Discussion

Defendants have now moved for summary judgment.  First, defendants argue they are sued in their official capacities only.  As there is no evidence of any custom or policy of Benton County that was a moving force behind any alleged violation of plaintiff's constitutional rights, they contend there is no basis on which they can be held liable under § 1983. Second, defendants

-27-

contend, even if it is assumed for purposes of this motion that Lee gave Daniels the wrong medication,  Lee's conduct at most constitutes negligence which does not state a claim under § 1983.  Finally, defendants assert Daniels was provided due process in connection with each disciplinary action taken against him.

### Official Capacity v. Individual Capacity Claims

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States.  In order to state a claim under 42 U.S.C. § 1983, plaintiff must allege that the defendants acted under color of state law and that they violated a right secured by the Constitution.  *West v. Atkins*, 487 U.S. 42, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir.1999).   The deprivation must be intentional; mere negligence will not suffice to state a claim for deprivation of a constitutional right under § 1983. *Daniels v. Williams*, 474 U.S. 327, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986); *Davidson v. Cannon*, 474 U.S. 344, 106 S. Ct. 668, 88 L. Ed. 2d 677 (1986).

Under § 1983, a defendant may be sued in either his individual capacity, or in his official capacity, or claims may be stated against a defendant in both his individual and his official capacities.  In *Gorman v. Bartch*, 152 F.3d 907 (8th Cir. 1998), the Eighth Circuit discussed the distinction between individual and official capacity suits.  As explained by the *Gorman* case:

> Claims against government actors in their individual capacities differ from those in their official capacities as to the type of conduct that is actionable and as to the type of defense that is available. *See Hafer v. Melo*, 502 U.S. 21, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991).  Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only type of immunity available is one belonging to the entity itself. *Id.* 502 U.S. at

-28-

24-27, 112 S. Ct. at 361-62 (1991). Personal capacity claims, on the other hand, are those which allege personal liability for individual actions by officials in the course of their duties; these claims do not require proof of any policy and qualified immunity may be raised as a defense. *Id.* 502 U.S. at 25-27, 112 S. Ct. at 362.

*Gorman*, 152 F.3d at 914.

The Eighth Circuit has advised plaintiffs to specifically plead whether government agents are being sued in their official or individual capacities to ensure prompt notice of potential personal liability. *Nix v. Norman*, 879 F.2d 429, 431 (8th Cir. 1989). *See also Andrus v. Arkansas*, 197 F.3d 953 (8th Cir. 1999)(In actions against officers specific pleading of individual capacity is required to put public officials on notice they will be exposed to personal liability). When the plaintiff fails to state whether he is suing an official in his individual capacity, the Eighth Circuit has construed the claim to be against the official in his official capacity only. *See Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999)("[I]n order to sue a public official in his or her individual capacity, a plaintiff must expressly and unambiguously state so in the pleadings, otherwise, it will be assumed that the defendant is sued only in his or her official capacity."); *Egerdahl v. Hibbing Community College*, 72 F.3d 615, 620 (8th Cir. 1995)("*Nix* requires that a plaintiff's complaint contain a clear statement of her wish to sue defendants in their personal capacities. Neither a cryptic hint in a plaintiff's complaint nor a statement made in response to a motion to dismiss is sufficient.").

At the same time, we are charged with liberally construing pro se complaints. *See e.g. Wishnatsky v. Rovner*, 433 F.3d 608, 610 (8th Cir. 2006)(requirement that pro se complaints be construed even more liberally than counseled pleadings); *White v. Wyrick*, 530 F.2d 818, 819 (8th

-29-

Cir. 1976)(finding pro se petition should be "interpreted liberally and . . . should be construed to encompass any allegation stating federal relief").  In responding to the summary judgment motion, Daniels has noted that he intended to sue the defendants in both their individual and official capacities. *Resp.* at ¶ 146.  He also filed a motion to amend his complaint (Doc. 34) to, among other things, specify that he is suing the defendants in both their individual and official capacities. *See e.g., Murphy v. Arkansas*, 127 F.3d 750, 755 (8th Cir. 1997)(complaint against state officials who were sued in their official capacities was deemed amended to assert personal capacity claims, where plaintiff moved to amend complaint in response to motion for summary judgment).  The motion to amend will be granted by separate order.

### Alleged Mistaken Dose of Medication

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 1719, 140 L. Ed. 2d 1043 (1998)(citation omitted).  In *Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006), the Eighth Circuit held that deliberate indifference is the "appropriate standard of culpability for all claims that prison officials failed to provide pretrial detainees with adequate food, clothing, shelter, medical care and reasonable safety."

"In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle  v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).  The deliberate indifference standard includes "both an objective and a subjective component:  'The [plaintiff] must demonstrate (1)

-30-

that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)). Additionally, "'[t]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" *Jolly*, 205 F.3d at 1096 (*quoting Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir.1995)). *See also Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000)("To establish a constitutional violation, it is not enough that a reasonable official should have known of the risk, a plaintiff must establish that the official in question did in fact know of the risk.").

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156 (1992). "A medical need is serious if it is obvious to the layperson or supported by medical evidence." *Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir. 1997) (per curiam) (internal quotation and citation omitted).

The medication Lee was passing out was prescribed by medical personnel. Daniels makes no claim that Lee deliberately gave him another inmate's medication. *Resp.* at ¶ 148. Instead, Daniels contends the alleged error was due to negligence and/or inattentiveness. *Id.* at ¶ 145. Negligence does not state a claim of constitutional dimension. *See e.g., Sellers v. Baer*, 28 F.3d 895, 902-903 (8th Cir. 1994)(citations omitted)(negligence, even gross negligence, is not actionable under § 1983).

-31-

The mistaken administration of a dose of medication has been specifically held not to constitute deliberate indifference. *See e.g., Colon v. Correctional Medical Services*, No. 07-189, 2007 WL 2257424, *2 (D. Del. Aug. 1, 2007)("[E]ven accepting Plaintiff's allegations as true, the Court concludes that the act of giving the wrong medication does not rise to the level of deliberate indifference."); *Nard v. Colclough*, No. 4:05-cv-00429, 2007 WL 30218 (E.D. Ark. Jan. 3, 2007)("Assuming that the Defendant, as Plaintiff contends, was the person who came to his room, gave him the wrong medication, and told him to take it even after Plaintiff expressed his belief that it was the wrong medication, such conduct, without more, does not rise to the level of deliberate indifference to his serious medical needs.  Deliberate indifference does not exist where a prison or state official inadvertently or negligently fails to provide adequate medical care."); *Buchanan v. McCool*, No. 2:03-cv-110, 2006 WL 3044446, *12 (E.D. Tex. Oct. 25, 2006)("Buchanan's claim regarding the erroneous administration of medication is a textbook claim of negligence.").  Moreover, there is no constitutional requirement that medically trained personnel do not pass out the medication.  *See e.g., Booker v. Herman*, 2006 WL 2457230, *5 (N.D. Ind.  Aug. 22, 2006)("While it might be a good practice, tradition, or even state law to require that only medical staff can deliver medication, the Constitution does not prohibit guards from distributing medication to inmates.  This allegation states no claim upon which relief can be granted").

### *Placement in Lock-down*

"We begin with the fundamental principle that a person held in confinement as a pretrial detainee may not be subjected to any form of punishment for the crime for which he is charged."

-32-

*Rapier v. Harris*, 172 F.3d 999, 1002 (7th Cir. 1999). *See also Bell v.* Wolfish, 441 U.S. 520, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979)(detainees "may not be punished prior to an adjudication of guilt in accordance with due process of law"); *Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992)("Pretrial detainees are presumed innocent and may not be punished."). A pretrial can be punished for misconduct that occurs while he is awaiting trial. *Rapier*, 172 F.3d at 1003. However, "[a] pretrial detainee cannot be placed in segregation as a punishment for a disciplinary infraction without notice and an opportunity to be heard; due process requires no less." *Higgs v. Carver*, 286 F.3d 437, 438 (7th Cir. 2002).

In this case, each time Daniels was charged with a disciplinary violation, he had an opportunity to be heard, a finding was made, a punishment determined, and he had an opportunity to appeal. Daniels does not deny that he was provided with these procedural protections. Rather, he merely seeks now to dispute the rule violations. This he cannot do.

Moreover, there is no indication the named defendants were personally involved in charging Daniels with any rule violations, in the disciplinary hearings, or in the appeals from a disciplinary punishment. *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007)("Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights. To establish personal liability of the supervisory defendants, [the plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights")(internal quotation marks and citation omitted). Sheriff Ferguson's "general responsibility for supervising the operations of [the jail are] insufficient to establish personal involvement." *Ouzts v. Cummins*, 825 F.2d 1276, 1277 (8th Cir. 1987). Defendants are therefore entitled to summary judgment on this claim.

-33-

## Conclusion

For the reasons stated, I recommend that the defendants' motion for summary judgment (Doc. 24) be granted.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 17th day of August 2007.

/s/ *J. Marschewski*

HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

-34-

AO72A
(Rev. 8/82)